615 A.2d 1197

**PRINCE GEORGE'S COUNTY, Maryland**

v.

**Russell YOUNKERS.**

**No. 63, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Nov. 25, 1992.

Barbara Radcliff, Bowie (Michael P. Whalen, County Atty. and Albert J. Lochte, Deputy County Atty., Upper Marlboro, on the brief), for appellant.

Benjamin R. Wolman (Debra L. Luzietti–Myers, on the brief), Upper Marlboro, for appellee.

Argued before BISHOP, ROSALYN B. BELL and FISCHER, JJ.

FISCHER, Judge.

In this case, we are asked to decide whether the Prince George's County Police Department's attempt to discipline one of its officers impinged on the officer's constitutionally protected speech. The Police Department filed administrative charges against Sergeant Russell Younkers, the appellee, as a result of Sgt. Younkers' conduct on two occasions. A hearing board subsequently found Sgt. Younkers guilty of violating the Prince George's County Code and the Police Department's Manual of Rules and Procedures. The Chief of Police concurred with the Board's conclusions and notified Sgt. Younkers that, as disciplinary action, the Sergeant would receive a written reprimand and would be reassigned to another duty station. Sgt. Younkers then appealed the Board's ruling to the Circuit Court for Prince George's County. The court reversed, reasoning that Sgt. Younkers' speech on the two occasions in question was constitutionally protected. The Police Department appeals and presents two issues which we have re-numbered:

1. Did the court err when it held that the appellee's speech was protected by the First Amendment to the United States Constitution?

2. Did the court exceed its authority by substituting its judgment for that of the trial board?

The facts giving rise to this case involve two separate incidents. The first incident concerned one of Sgt. Younkers' subordinates who was allegedly observed speeding while in a police cruiser on the Capital Beltway. Sgt.

Younkers was directed by a superior officer to inquire into the matter and, if Sgt. Younkers found an impropriety, to take appropriate action. While conducting his inquiry and while in the presence of the subordinate in question, Sgt. Younkers commented to a lieutenant, "[I]f this had been a Captain or a Major or some other white shirt,[1] they would have thrown this thing in the trash."

The second incident occurred after a shooting in which another of Sgt. Younkers' subordinates had been involved. Sgt. Younkers was called to oversee the scene where, among other things, he spoke with the officer involved in the shooting. The officer expressed concern because she had been involved in a previous shooting and informed Sgt. Younkers that she wanted to contact an attorney before giving statements to anyone. Sgt. Younkers used departmental radio equipment to contact the police union attorney on behalf of the officer. Some time later, while he was performing other duties at the scene, Sgt. Younkers noticed that a crowd was gathering (media, neighborhood residents, etc.). Realizing that the officer involved in the shooting was alone, Sgt. Younkers ordered another of his subordinates to "go back and stay with [the officer] and remind her that she is not supposed to talk to anyone."

Sgt. Younkers was subsequently charged with violating the Police Department's Manual of Rules and Procedures, Volume III, Chapter 802.10, County Personnel Law, § 16–108 which provides in part, "Supervisors and employees generally of the county government are expected to diligently perform duties, tasks and responsibilities assigned to further the mission of the Department and the County Government." In addition, Sgt. Younkers was charged with violating § 1/110 (loyalty) and § 1/115 (unbecoming

---

1. "White shirt" is a term commonly used by members of the Prince George's County Police Department to differentiate the higher ranking police officers, whose uniform shirts are white, from the lower ranking police officers, whose uniform shirts are gray.

conduct) of the Manual of Rules and Procedures. Section 1/110 states:

Officers will be expected to exercise reasonable and just discretion in the performance of their duties. Recognizing that decisions will frequently be extremely difficult and made in emergency situations, officers are legally, professionally, and personally bound to exercise those judgments within the confines of their loyalty to their oath of service and their obligation to the law, regardless of personal hardship or discomfort.

Section 1/115 provides:

As the most visible representative of government, officers must display unblemished professional conduct. To that end, officers are held bound to avoid excessive, unwarranted, or unjustified behavior that would reflect poorly on themselves, the department, or the government of Prince George's County, regardless of duty status. Members will refrain from using harsh, violent, profane or derogatory language which would demean the dignity of any person.

Sgt. Younkers was also charged with violating § 18–157 of the County Code which prohibits members of the Police Department from "directly or indirectly criticiz[ing] or ridicul[ing] any official action of any member of the Department."

The Police Department argues that Sgt. Younkers acted in a manner that was openly disrespectful of the leadership of the Police Department and that he resisted in performing an order (by failing to discipline the officer accused of speeding). The Department adds that Sgt. Younkers' actions in responding to the officer who had been involved in the shooting led Sgt. Younkers' superiors to believe that information was being withheld. In sum, the Department contends that Sgt. Younkers acted in a manner to cause a division between the ranks of the Police Department and "that Sgt. Younkers' attitude and demeanor had the effect of disparaging the Police Department and encouraging disloyalty and a lack of respect by other officers."

A hearing board received evidence on the alleged violations and decided, with regard to the first incident, that "Sergeant Younkers did, while assigned in a supervisory role ... employ ridicule and criticism to discourage an official action of the Department management staff.... As the Board applies the applicable statute and rule to this hearing, the words are beyond a reasonable definition of protected speech." With regard to the second incident, the Board concluded, "Younkers did in fact issue an Order to direct a subordinate to refuse to make any statement during the review of the subject incident and that the order exceeded his authority and professional responsibility as a police supervisor acting on behalf of the Police Department of Prince George's County." On appeal, however, the circuit court found that the statements Sgt. Younkers had made during the two incidents were constitutionally protected.

The Supreme Court has repeatedly held that a governmental entity may not discharge an employee for reasons that infringe on the employee's constitutionally protected speech. *Perry v. Sinderman,* 408 U.S. 593, 597–598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972). In the same vein, the Maryland Law Enforcement Officers' Bill of Rights (LEOBR), applicable to the police departments of all Maryland counties, Md.Ann.Code Art. 27, § 727(b)(2), provides at § 733:

A law enforcement officer may not be discharged, disciplined, demoted, or denied promotion, transfer or reassignment, or otherwise discriminated against in regard to his employment or be threatened with any such treatment, by reason of his exercise of or demand for the rights granted in the subtitle, or by reason of the lawful exercise of his constitutional rights.

For guidance in resolving Sgt. Younkers' constitutional challenge, we look to several Supreme Court decisions. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court was asked to decide whether the dismissal of an Illinois teacher contravened the

teacher's First Amendment rights. The teacher, Pickering, was dismissed from his employment after he had written a letter to a local newspaper criticizing the School Board's allocation of funds and its proposals to raise new revenue. While acknowledging Pickering's right to comment on matters of public interest in connection with the operation of public schools, the Court added:

> At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35.

The Court declined to establish a rigid standard for resolving such conflicts but, instead, offered some guidelines to aid in the resolution of these matters. First, the Court noted that Pickering's statements were not directed toward any person with whom Pickering would normally be in contact during the course of his daily work. Thus, the Court found "no question of maintaining either discipline by immediate superiors or harmony among co-workers...." *Pickering*, 391 U.S. at 570, 88 S.Ct. at 1735.

The Court next commented that Pickering's employment relationship with the School Board and the superintendent were "not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering*, 391 U.S. at 570, 88 S.Ct. at 1735. In addition, the Court noted that although the Board had alleged that the publication of the letter damaged the professional reputation of the Board and the superintendent and would foster controversy among the Board, teachers, administrators, and local residents, the Board offered no evidence to support

these allegations. Last, the Court observed that where the issues of education funding and spending were left to a popular vote, those issues were matters of legitimate public concern for which free and open debate was vital to informed decision-making. *Pickering*, 391 U.S. at 571–572, 88 S.Ct. at 1736. Thus, the Court concluded that Pickering's letter to the newspaper was protected under the First Amendment and that his dismissal contravened principles of free speech.

Having ruled in *Pickering* that a public employee does not, by virtue of government employment, relinquish First Amendment rights, the Supreme Court revisited this issue in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The case involved an Assistant District Attorney, Myers, who was discharged for circulating a questionnaire concerning internal office affairs. The genesis of the case occurred when Myers was informed that she would be transferred to prosecute cases in a different section of criminal court. Myers had been employed as a prosecutor for more than five years and had competently performed her duties during that time. Myers strongly opposed the transfer and expressed her displeasure to several of her supervisors, including Connick, the District Attorney. Myers was again notified of the pending transfer, and she then had a second conversation with one of her supervisors. They spoke about several other office matters in addition to the transfer. During their conversation, the supervisor expressed the belief that other employees did not share Myers' concerns, and Myers stated that she would do some research on the matter.

That night, Myers prepared a questionnaire to obtain her co-workers' views on the office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. The next morning, Myers typed, copied, and distributed the questionnaire to fifteen Assistant District Attorneys. When Connick was told that Myers was creating a " 'mini-insurrection,' " he

terminated Myers for her refusal to accept the transfer. Connick also informed Myers that he considered the distribution of the questionnaire an act of insubordination. *Connick*, 461 U.S. at 140–141, 103 S.Ct. at 1687.

Myers subsequently filed suit, contending that she had been wrongfully terminated because she had exercised her right to free speech. The District Court found that, although Myers was told she was fired because of her refusal to accept the transfer, the real reason for her dismissal was the distribution of the questionnaire. The court further held that the questionnaire involved matters of public concern and that the State had not " 'clearly demonstrated' " that the survey " 'substantially interfered' " with the operations of the District Attorney's office. *Connick*, 461 U.S. at 141–142, 103 S.Ct. at 1687. The United States Court of Appeals for the Fifth Circuit affirmed the District Court's decision. The Supreme Court granted certiorari and reversed.

The Supreme Court first considered whether the questionnaire involved a matter of public concern. To resolve this issue, the Court examined the content, form, and context of the questionnaire, as revealed by the entire record and found:

> In this case, with but one exception, the questions posed by Myers to her co-workers do not fall under the rubric of matters of 'public concern.' We view the questions pertaining to the confidence and trust that Myers' co-workers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court.
>
> .    .    .    .    .
>
> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment,

public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick,* 461 U.S. at 147–149, 103 S.Ct. at 1690–1691.

The Court did find, however, that one of the questions on Myer's questionnaire touched upon a matter of public concern. Question 11 inquired whether assistant district attorneys ever felt "pressured to work in political campaigns on behalf of office supported candidates." The Court had previously held that official pressure upon employees to work for certain political candidates amounted to a coercion of belief that violated fundamental constitutional rights. *See Branti v. Finkel,* 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293–1294, 63 L.Ed.2d 574 (1980). As Question 11 addressed a matter of public concern, the Court next considered whether Myers' First Amendment interest outweighed Connick's interest, as an employer, in promoting the efficiency of the public service his office performs through its employees.

On this point, the Court opined, "[T]he State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests." *Connick,* 461 U.S. at 150, 103 S.Ct. at 1692 (footnote omitted). "The *Pickering* balance," the Court added, "requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick,* 461 U.S. at 150, 103 S.Ct. at 1692.

Applying this balancing test, the Court stated, "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking

action." *Connick,* 461 U.S. at 151–152, 103 S.Ct. at 1692 (footnote omitted).

Also relevant to this test is the time, place, and manner of the employee's speech.

'When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered.' ... [T]he fact that Myers, unlike Pickering, exercised her rights to speech at the office supports Connick's fears that the functioning of his office was endangered.

Finally, the context in which the dispute arose is also significant.... When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office.

*Connick,* 461 U.S. at 153, 103 S.Ct. at 1693 (quoting *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979)).

Ultimately, the Court concluded, "The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment." *Connick,* 461 U.S. at 154, 103 S.Ct. at 1694.

Several years after *Connick,* the Court was presented with another employee/free speech scenario. *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315, *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987), involved McPherson, a clerical employee in a county Constable's office, who had been discharged for remarking, after hearing of an attempt on the life of the President of the United States, "If they go for him again, I hope they

get him." The statement was made to one co-worker and was overheard by another employee who, unbeknown to McPherson, was in the room at the time.

In deciding whether McPherson's dismissal infringed on her constitutionally protected speech, the Court first decided that McPherson's speech "plainly dealt with a matter of public concern." *Rankin*, 483 U.S. at 386, 107 S.Ct. at 2898. The Court next balanced McPherson's interest in making her statement against the interest of the State, as an employer, in efficiently providing public services. On this point, the Court observed:

> Constable Rankin testified that the possibility of interference with the functions of the Constable's office had *not* been a consideration in his discharge of respondent and that he did not even inquire whether the remark had disrupted the work of the office.
>
> .    .    .    .    .
>
> Not only was McPherson's discharge unrelated to the functioning of the office, it was not based on any assessment by the Constable that the remark demonstrated a character trait that made respondent unfit to perform her work.
>
> .    .    .    .    .
>
> In weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no confidential, policymaking, or public contract role, the danger to the agency's successful functioning from that employee's private speech is minimal.

*Rankin*, 483 U.S. at 389–391, 107 S.Ct. at 2900–2901 (emphasis in original). The Court then concluded, "Given the

function of the agency, McPherson's position in the office, and the nature of her statement, we are not persuaded that Rankin's interest in discharging her outweighed her rights under the First Amendment." *Rankin*, 483 U.S. at 392, 107 S.Ct. at 2901.

Applying the teachings of the Supreme Court to the case currently before us, we find that the disciplinary action taken against Sgt. Younkers did not violate his First Amendment rights. For purposes of this discussion, we will assume that Sgt. Younkers' statements related to matters of public concern. This assumption triggers application of the balancing process in which we are to weigh the sergeant's interest in making his statements against the interest of the Police Department in providing effective, efficient service to the public. To conduct this balancing process, we consider the time, place, and manner of Sgt. Younkers' speech as well as the context in which his statements were made.

With regard to the first incident (the matter involving one of Sgt. Younkers' subordinates who was allegedly observed speeding), Sgt. Younkers, while in the presence of the purportedly offending officer, remarked to a lieutenant that, if the incident had involved a high ranking officer, no action would have been taken. At the least, Sgt. Younkers' statement planted the seed of dissension by implying that officers of varying ranks received disparate treatment.

As in *Connick*, this case involves an employment situation where close working relationships are essential to fulfilling the Police Department's responsibilities. The Police Department is a compelling example of an institution where camaraderie is one of the cornerstones of its functioning. *Warner v. Town of Ocean City*, 81 Md.App. 176, 184, 567 A.2d 160 (1989); *Beeler v. Behan*, 55 Md.App. 517, 522, 464 A.2d 1091 (1983). It is not hyperbole to say that the lives of the officers, as well as the citizens they protect, depend on cooperation and order within the Department.

The Eighth Circuit Court of Appeals has similarly stated:

> More so than the typical government employer, the [State Highway] Patrol has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution.' *Gasparinatti v. Kerr,* 568 F.2d 311, 315–16 (3rd Cir. 1977), *cert. denied,* 436 U.S. 903 [98 S.Ct. 2232, 56 L.Ed.2d 401] ... (1977).... As the Supreme Court recognized in *Kelley v. Johnson,* 425 U.S. 238, 246–47 [96 S.Ct. 1440, 1445, 47 L.Ed.2d 708] ... (1976), a police department has a substantial interest in developing 'discipline, *esprit de corps* and uniformity' within its ranks so as to insure the safety of persons and property. [Citations omitted.]

*Hughes v. Whitmer,* 714 F.2d 1407, 1419 (8th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1983).

The Seventh Circuit Court of Appeals has also acknowledged that, in the context of law enforcement agencies, the state's interests are "particularly acute" in maintaining discipline and in encouraging a close and personal relationship between an employee and his superiors, where that relationship calls for loyalty and confidence. *Egger v. Phillips,* 710 F.2d 292, 319 (7th Cir.1983), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). "Mutual trust and respect among [officers] and between [officers] and supervisory personnel are particularly important in law enforcement.... And given the high stakes involved— sometimes life and death decisions are made—the risks of disharmony can be grave." *Egger,* 710 F.2d at 319.

Sgt. Younkers' statement, made in the presence of the subordinate he was to discipline, certainly could have undermined the working relationship essential among police officers. We reiterate the Supreme Court's opinion that it is unnecessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking

actions." *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692 (footnote omitted).

In addition, the statements at issue here were made by a police officer who was acting in a supervisory capacity. It is likely that Sgt. Younkers' statements would have had a significant influence and impact on the subordinate officers who heard his remarks. In a factual situation analogous to the case now before us, the Court of Appeals for the Ninth Circuit affirmed a judgment against a police officer who was disciplined for making disrespectful and disparaging remarks about a superior officer while addressing subordinates during morning inspection. *Kannisto v. City and County of San Francisco,* 541 F.2d 841 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977). The officer's remarks were found to have violated a departmental regulation proscribing misconduct and insubordination.

Quoting the language of *Kelley,* 425 U.S. at 246, 96 S.Ct. at 1445, the Ninth Circuit emphasized the police department's "substantial interest in developing 'discipline, *esprit de corps,* and unity.' " *Kannisto,* 541 F.2d at 843. The court continued, "Certainly a prohibition against the communication of an officer's disaffection to rank-and-file members of the department during regular duty hours may be considered as a necessary adjunct to the department's substantial interest in maintaining discipline, morale and uniformity." *Kannisto,* 541 F.2d at 841.

Citing *Kannisto,* the California Court of Appeal disposed of a highway patrol officer's claim that his dismissal from the force violated his First Amendment free speech rights. *Hosford v. State Personnel Bd.,* 74 Cal.App.3d 302, 141 Cal.Rptr 354 (1977). Among other things, the officer was dismissed for expressing "disdain and disrespect for his commanding officers and for the highway patrol. [His] remarks, spoken in the presence of both inferior and superior officers, were all made in the context of the work relationship." *Hosford,* 74 Cal.App.3d at 306, 141 Cal.Rptr. 354. The court held that Hosford's "First Amendment

claim must fail," because, "the highway patrol's interest in developing discipline, *esprit de corps*, and good morale among its members far outweighs any legitimate interest which Hosford could assert in undermining those efforts with unsolicited, disparaging remarks to or about his commanding officers in the course of duty." *Hosford*, 74 Cal.App.3d at 306, 141 Cal.Rptr. 354.

As a supervisor, Sgt. Younkers bore a substantial "burden of caution ... with respect to the words [he spoke]," *Rankin*, 483 U.S. at 390, 107 S.Ct. at 2900, while in the presence of both superior and subordinate officers. Under the circumstances, we believe that the balancing test weighs in favor of the Police Department.[2]

We reach the same conclusion regarding the second incident. The second incident concerned one of Sgt. Younkers' subordinates who had been involved in a shooting. The officer had asked to speak with an attorney, and on the officer's behalf Sgt. Younkers contacted the attorney representing the police union. Meanwhile, Sgt. Younkers ordered that the officer was not to speak to anyone. This order was to be conveyed by another of Sgt. Younkers' subordinates who was so surprised by the order that he inquired, "Can we do that?" Concern later arose that Sgt. Younkers' order had the effect of hindering a thorough investigation of the shooting.

While we appreciate Sgt. Younkers' attempt to safeguard the interests of his subordinates, we cannot overlook the fact that his ultimate duty is to the Police Department. Particularly in a supervisory role, and as the officer "in charge" of this crime scene, Sgt. Younkers was obliged to act in an impartial manner. His order may have conveyed the impression that he was protecting the officer involved in the shooting from the inquiring eyes of departmental investigators.

---

2. Considering the circumstances under which Sgt. Younkers' statement was made, we do not view this incident as a "whistle blower" type situation.

Here, too, such a rift between the various units within the Police Department could destroy important working relationships and ultimately impinge on the functioning of the Department. It is certainly a legitimate interest of the Police Department to squelch an "us against them" mentality when both the "us" and the "them" are members of the same police force who are merely performing their various assigned roles. We find, in light of the circumstances surrounding this incident, that the interest of the Department in disciplining an officer for making statements that the Department reasonably believed could disrupt the office, undermine authority, and destroy close working relationships outweighed the interest of the officer in making the statements. The disciplinary action against Sgt. Younkers did not, therefore, contravene the First Amendment.[3]

While, in light of this holding, we need not address the Police Department's second issue—that the circuit court impermissibly substituted its judgment for that of the hearing board—we believe a few words are in order to clarify certain misunderstandings. First, the LEOBR provides that appeals from disciplinary proceedings, like those at issue here, shall proceed before the circuit court pursuant to Maryland Rule B2. Art. 27, § 732. In addition, an aggrieved party may appeal the decision of the circuit court to the Court of Special Appeals. Art. 27, § 732. The LEOBR is silent, however, as to the scope of review.[4]

---

3. If Sgt. Younkers had prevailed on the balancing test, and if we had found his speech a matter of public concern, we would have remanded the case for a finding of fact on whether the sergeant's speech played a substantial part in the Department's decision to discipline him. If, at that point, Sgt. Younkers had prevailed, the Department would then have borne the burden of proving, by a preponderance of the evidence, that it would have disciplined Sgt. Younkers in the absence of the protected speech. *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *DiGrazia v. County Exec. For Mont. Co.,* 288 Md. 437, 448, 418 A.2d 1191 (1980).

4. Section 10–215(g)(3) of the Maryland Administrative Procedure Act (APA), Md. State Gov't Code Ann., provides that, in cases where the APA is applicable, a reviewing court may reverse or modify the

Where the scope of review is not specified by statute, a corollary element in judicial review of administrative decisions for arbitrariness is a determination of whether the findings of the board were supported by substantial evidence:

'While a court reviewing a decision of a board ... may not substitute its judgment for that of the board, it will examine the record upon which the board's decision is based to determine whether the findings of the board are supported by substantial evidence. The scope of this judicial inquiry is commonly described in the orthodox terminology of the substantial evidence rule.'

*Annapolis v. Annap. Waterfront Co.*, 284 Md. 383, 397–398, 396 A.2d 1080 (1979) (quoting R. Anderson, *American Law of Zoning and Planning*, § 25.27 at 269–270 (2d ed. 1977)) (footnotes omitted). *See also Terranova v. Board*, 81 Md.App. 1, 7–10, 566 A.2d 497 (1989), *cert. denied*, 319 Md. 484, 573 A.2d 808 (1990).

Were we to address the Police Department's second issue, we would conclude that the findings of the hearing board were supported by substantial evidence.

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEE.

---

decision of the agency under certain enumerated conditions. The APA defines "agency" as: "(1) an officer or unit of the State government authorized by law to adjudicate contested cases; or (2) a unit that: (i) is created by general law; (ii) operates in at least 2 counties; and (iii) is authorized by law to adjudicate contested cases." State Gov't Art., § 10–201(b). The Maryland State Police Hearing Board is an agency whose decisions are subject to review under § 10–215(g)(3) of the APA. *Maryland State Police v. Lindsey,* 318 Md. 325, 332–333, 568 A.2d 29 (1990).