633 A.2d 861

**Russell YOUNKERS**

v.

**PRINCE GEORGE'S COUNTY, MARYLAND.**

No. 19, Sept. Term, 1993.

Court of Appeals of Maryland.

Dec. 8, 1993.

Benjamin R. Wolman (Wolman & Lucchi, both on brief), Upper Marlboro, for petitioner.

Barbara M. Radcliff, Special Counsel, Bowie (Michael P. Whalen, County Atty., on brief), Upper Marlboro, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

Russell Younkers, a sergeant on the Prince George's County Police Department, was administratively charged with violations of the police department's Manual of Rules and Procedures as a result of separate incidents occurring on 8 February and 11 February, 1989. In the first incident, Sergeant Younkers was alleged to have made inappropriate remarks critical of the department's policy and of higher ranking officers, in the presence of other police officers and a subordinate officer he was supposed to be counseling. In the second incident, Sergeant Younkers is alleged to have acted improperly in directing that a corporal under his command,

who had just been involved in a shooting, remain silent. Sergeant Younkers refused to accept the proposed disciplinary action, and demanded a hearing on the charges pursuant to the Law Enforcement Officers' Bill of Rights (LEOBR), Maryland Code (1957, 1992 Repl.Vol.) Art. 27, §§ 727–734D.

An administrative hearing board (the hearing board) found Younkers guilty of charges in connection with both incidents, and the Chief of Police directed that Younkers be reprimanded and transferred. Younkers appealed to the Circuit Court for Prince George's County, and that court reversed, finding that Younkers's speech on each occasion was protected by the First Amendment to the United States Constitution, and that legitimate interests of the police department did not outweigh Younkers's right of expression. Prince George's County (the County) appealed to the Court of Special Appeals, and that court reversed the judgment of the circuit court, holding that the First Amendment was not a bar to the imposition of disciplinary sanctions in this case, and noting that the findings of the hearing board were supported by substantial evidence. *Prince George's County v. Younkers,* 94 Md.App. 48, 615 A.2d 1197 (1992). We granted Younkers's petition for certiorari, and we reverse in part.

## I. *Scope of Review*

The LEOBR provides for an appeal to the circuit court and thereafter to the Court of Special Appeals, Art. 27, § 731(d)(3) and § 732, but does not specify the scope of judicial review. When a state police agency is involved, the state Administrative Procedure Act (APA) applies, and the scope of judicial review is spelled out by § 10–222(h)3 of that Act. *See* Maryland Code (1984, 1993 Repl.Vol., 1993 Cum.Supp.) §§ 10–201 through 10–226 of the State Government Article. The appeal in this case was not from an "agency" as defined by the APA, § 10–202(b), and thus the scope of judicial review in this case is that generally applicable to administrative appeals.

Chief Judge Hammond, speaking for the Court in *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 236 A.2d 282 (1967), said:

Whichever of the recognized tests the court uses—substantiality of the evidence on the record as a whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence on the entire record—its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is difficult to precisely articulate but it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.

*Id.* at 309–10, 236 A.2d 282 (citations omitted). In *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 390 A.2d 1119 (1978), Judge Eldridge on behalf of the Court discussed the scope of judicial review of administrative agencies, and said:

"Substantial evidence," as the test for reviewing factual findings of administrative agencies, has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Snowden v. Mayor & C.C. of Balto.,* 224 Md. 443, 448, 168 A.2d 390 (1961). The scope of review "is limited 'to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached,'" [citing cases within and without the State, treatises, and law journals].

In applying the substantial evidence test, we have emphasized that a "court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken." *Bernstein v. Real Estate Comm.,* 221 Md. 221, 230, 156 A.2d 657 (1959), *appeal dismissed,* 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960). We also must review the agency's decision in the light most favorable to the agency, since

"decisions of administrative agencies are prima facie correct," *Hoyt v. Police Comm'r*, 279 Md. 74, 88–89, 367 A.2d 924 (1977), and "carry with them the presumption of validity," *Dickinson–Tidewater, Inc. v. Supervisor*, 273 Md. [245,] 256[, 329 A.2d 18 (1974) ]; *Heaps v. Cobb*, 185 Md. 372, 378, 45 A.2d 73 (1945). Furthermore, not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences.

*Id.* 283 Md. at 512–13, 390 A.2d 1119 (alteration in original) (some citations omitted). More recently, we have said:

[T]he order of an administrative agency must be upheld on judicial review if it is not based on an error of law, and if the agency's conclusions reasonably may be based upon the facts proven. *Ad + Soil, Inc. v. County Commr's*, 307 Md. 307, 338–39, 513 A.2d 893 (1986). But a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law. *See, e.g., Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 835, 490 A.2d 1296 (1985); *Harford County v. McDonough*, 74 Md.App. 119, 122, 536 A.2d 724 (1988).

*People's Counsel v. Maryland Marine*, 316 Md. 491, 496–97, 560 A.2d 32 (1989). With these principles in mind, we examine the findings and conclusions of the hearing board, as adopted by the Chief of Police, as to each incident.

## II. *Incident of 8 February 1989*

In early February 1989, Lieutenant Colonel David Mitchell of the Prince George's County Police Department was driving an unmarked cruiser on Interstate 495 when he observed a marked Prince George's County police cruiser approaching from the rear at a high rate of speed. Mitchell testified that there was no other vehicle between the approaching cruiser and his vehicle; that he saw the operator of the speeding cruiser, later identified as Corporal Phair, glance toward him, slow down, pass him, and then travel at a speed of approximately 65 miles per hour before exiting at Central Avenue. Colonel Mitchell contacted communications and determined

that the marked cruiser was not responding to an emergency call. When he arrived at his office, the Colonel sent a memorandum to the district commander, directing that Corporal Phair receive verbal counseling from a supervisor concerning unnecessary speeding by a police cruiser.

Colonel Mitchell's memorandum was routed down the chain of command to Lieutenant Thomas Evans, commander of the district to which Corporal Phair was assigned. Lieutenant Evans directed Sergeant Younkers, who was Corporal Phair's immediate supervisor, to look into the matter and to report back to him with the results. Lieutenant Evans testified that he observed Sergeant Younkers in conversation with Corporal Phair in the sector supervisor's office. He said that Sergeant Younkers was sitting at his desk, and Corporal Phair and a recruit officer being trained by Corporal Phair were seated opposite him. Lieutenant Evans testified he believed another sergeant was present in the room engaged in other work, and that another corporal may have also been present. Lieutenant Evans testified that he overheard a part of the conversation:

> I heard a police supervisor, Sergeant Russell Younkers, tell a subordinate officer, in the presence of a recruit officer, that if this matter had involved a "white shirt" [1] or a captain it would be thrown in the trash and nothing would be done. And I found that distressing.

Upon hearing that statement, Lieutenant Evans informed Sergeant Younkers that he wished to see him in the lieutenant's office. At the meeting that followed, the lieutenant told Sergeant Younkers that he felt the sergeant had made an improper remark, and Sergeant Younkers agreed that he could have made a better choice of words. The recommendation for disciplinary action followed.

---

1. Witnesses testified that the term "white shirt" is sometimes employed by rank-and-file officers to refer to any police officer of the rank of lieutenant or above. It was generally agreed that the term itself does not carry a derisive or disrespectful connotation.

Sergeant Younkers gave a somewhat different version of the incident. He stated that Lieutenant Evans gave him the memorandum from Colonel Mitchell and instructed him to "give Phair a counseling form in regards to this." Younkers protested the issuance of a counseling form without first asking Phair whether he had done anything wrong. According to Younkers, Evans told him, "If a Lieutenant Colonel in this Police Department said he did it, he did it." Notwithstanding that remark, Evans agreed that Younkers should discuss the matter with Phair, and then "get back to [Evans] about it."

Younkers testified that he discussed the matter with Corporal Phair in the presence of a "rookie" officer who was then being trained by Phair. He said Corporal Phair explained to him that he was in the process of obtaining a pace on a vehicle he thought was speeding, when that vehicle came up behind another vehicle, later determined to be Colonel Mitchell's vehicle. Younkers testified that Phair told him he maintained a steady speed, and thought the colonel's vehicle appeared to have been going above 55 miles per hour, the posted speed limit. Younkers said Phair told him he did not make a traffic stop because he saw that the lead vehicle was Colonel Mitchell.

With respect to the statement that forms the basis for the disciplinary action, Sergeant Younkers stated:

Phair and I were still discussing this when Lieutenant Evans, for lack of a better word, barged into the Sergeant's office and interrupted our conversation that we were having. Lieutenant Evans said to me, "What's going on with this thing? I've got to get back to the Colonel about this stuff." And I told the Lieutenant, "We are discussing it now." You know, "I will get back to you." He kept insisting that I give him some kind of final disposition, so to speak, on this complaint. And finally I just got so frustrated because he wouldn't allow me to talk with Phair and get to the bottom of the thing so I could report back to him. ... And I said to the Lieutenant—I didn't say it to Phair. I said to Lieutenant Evans, you know, "What's the big deal with this

thing? If this had been a Captain or a Major or some other white shirt, they would have thrown this thing in the trash.... And, you know, I said, "Lieutenant, I just don't understand this.... Crime is running rampant in this county. The homicide rate is twice what it used to be. Drugs are keeping us so busy, you know, we don't have time to do anything. And this is the most important thing a Lieutenant Colonel of this Police Department has got to worry about." And with that I guess Lieutenant Evans was completely enraged, and he stormed out of the office. And he told me to come see him afterwards, and he left.

Younkers testified that he did not counsel Corporal Phair.

Corporal Phair testified that he heard Sergeant Younkers refer to a "white shirt" when talking with Lieutenant Evans in his presence, but he denied hearing anything that he considered a negative comment made by Younkers. Corporal McBride, who was present in the sergeant's office when the conversation occurred, testified that he recalled the words "white shirt" being used, but did not know the context in which they were stated. Officer Chaney, who was in training under Corporal Phair, testified that he was present in the sergeant's office, sitting next to Corporal Phair, when Sergeant Younkers discussed the allegation of Corporal Phair's speeding. He recalled the response that Corporal Phair had given, but said he had no recollection of any conversation that took place between Sergeant Younkers and Lieutenant Evans.

The hearing board concluded that Sergeant Younkers did "employ ridicule and criticism to disparage an official action of the Department and a member of the Department management staff." Further, the hearing board found that "Sergeant Younkers used words in tone, a reasonable person would define as offensive generally, and especially when extended by a supervisory officer. And that action resulted in unbecoming and unprofessional conduct." The hearing board further stated that in its opinion, the "words and tone employed by Sergeant Younkers were beyond the scope of reasonable and professional criticism or political observation."

■ Younkers contends that the evidence was insufficient to support the imposition of a disciplinary sanction, because there was no proof that anyone else present in the room heard enough of his conversation with Lieutenant Evans to understand the context, and further, because there was no showing that his statements had any adverse impact upon the department. We do not agree. The statement, when made in the presence of other and subordinate officers, was inappropriate and censurable. That none of the officers present testified to understanding the context of the statement is not a decisive fact; the statement was made in the immediate presence of those who could have been expected to hear and understand it, and the hearing board could well have concluded that the statement should not have been made at that time and under those circumstances.

As the County concedes, had Sergeant Younkers taken Lieutenant Evans aside and expressed his personal displeasure in the same words, there would have been no basis for disciplinary action. The making of this statement, however, in the immediate presence of the subordinate officer he was questioning, and others, was improper. An organization such as the Prince George's County Police Department has a legitimate interest in maintaining strict discipline within its ranks. *Brukiewa v. Police Comm'r,* 257 Md. 36, 52, 263 A.2d 210 (1970). *See Jacocks v. Montgomery County,* 58 Md.App. 95, 472 A.2d 485 (1984) (finding of conduct unbecoming a police officer upheld where sergeant in presence of his supervisor and others told supervisor that "he could take his job and stick it up his ass"; and that he was "fed up with the bullshit that has been going on").

■ Younkers also contends that his constitutional right to free speech under the First Amendment was violated by the board's decision. He argues that because his speech involved the unequal enforcement of traffic laws, a matter of public concern, he is entitled to constitutional protection. The Court of Special Appeals discussed this contention at length, and reviewed the relevant cases decided by the United States

Supreme Court. *Prince George's County v. Younkers, supra,* 94 Md.App. at 52–59, 615 A.2d 1197. That court concluded, and we agree, that the disciplinary action taken against Younkers did not violate his First Amendment rights. *Id.* at 59, 615 A.2d 1197. As Judge Fischer said for the Court of Special Appeals, "Sgt. Younkers' statement, made in the presence of the subordinate he was to discipline, certainly could have undermined the working relationship essential among police officers." *Id.* at 60, 615 A.2d 1197. Although no demonstrable impact upon morale or discipline followed the making of this statement, the law is clear that it is unnecessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick v. Myers,* 461 U.S. 138, 152, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983) (footnote omitted). *See also Kannisto v. City and County of San Francisco,* 541 F.2d 841, 843 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977) ("[A] prohibition against the communication of an officer's disaffection to rank-and-file members of the department during regular duty hours may be considered as a necessary adjunct to the department's substantial interest in maintaining discipline, morale and uniformity."). Assuming, without deciding, that Younkers's speech on this occasion related to a matter of public concern, the interest of the police department in maintaining order and discipline within its ranks outweighs Younkers's right to make those statements at that time and place.

### III. *Incident of 11 February 1989*

■ On 11 February 1989, Sergeant Younkers was the officer in charge of a scene where Corporal Mary Shields had shot a suspect. When Lieutenant Larry Bowman arrived on the scene, Younkers walked him through the area, explaining what had occurred according to the investigation thus far conducted by Younkers. Lieutenant Bowman testified that as they were walking away from the person who had been shot, the following occurred:

Sergeant Younkers, he yelled to Corporal McBride, McBride, who was approximately, I guess, 30 or 40 feet away from him, and said something to the effect of, "Go tell Mary I said not to talk to anyone." And at that time McBride looked over, he looked kind of startled, and he started to say something. He didn't say anything, and then Sergeant Younkers told him, "Tell her I am giving her a direct order not to talk to anyone." And that was the extent of the conversation that I heard, and McBride then left the scene.

Lieutenant Bowman said that he did not speak to Sergeant Younkers about the statement he had made, because that was not part of his responsibility on the scene.

Corporal McBride testified that Sergeant Younkers told him to "go stand with Corporal Shields and not let anyone speak to her." Corporal McBride said the following then occurred:

I had turned around and asked him . . . "Does that include homicide?" . . . And at that point, he stated, "Tell her that is a direct order." I responded to Corporal Shields' location and relayed the order. I, during the meantime, I stopped and asked, "Can we do that?" I was a little bit puzzled. I had just never heard it before. But I didn't think it was improper, so I went ahead and [did] it.

Younkers was found in violation of § 16–108 of the county personnel law and § 1/110 of the county police manual of rules and procedures, in that he "exceeded [his] authority by giving an inappropriate order to a subordinate officer."

It is understandable that the facts as thus far stated concerning this incident gave rise to concern on the part of the department concerning Younkers's statements to Corporal McBride. When additional information that was before the hearing board and the Chief of Police is added, however, the foundation for finding a violation disappears. Sergeant Younkers testified that when he arrived on the scene of the shooting, he found Corporal Shields standing near the victim. He walked her away from the victim and inquired about her well-being. He was aware that she had been involved in

another shooting a short time before this incident, and he was concerned about her physical and emotional well-being. He said that Corporal Shields spoke of the previous incident, and told Younkers that she wanted to speak to Mr. Wolman, the attorney for the police union, prior to making any statements to anyone. Corporal Shields asked Younkers to attempt to contact Mr. Wolman, and shortly thereafter Younkers attempted to do so. Younkers then instructed Corporal Shields to go to her vehicle, and he instructed Corporal McBride to accompany her.

A short time later, when Younkers was escorting Lieutenant Bowman through the scene, Younkers saw Corporal McBride, and realized that Corporal Shields was then by herself. Younkers testified:

> And then in the million other things that a Sergeant has to do on a scene of something like [this] ... I realized that I had left Shields by herself out in front of this building, with all the neighborhood people gathering around, with the news media starting to arrive, with a lot of medical people coming onto the scene. She was sitting out in her police car out in front of this building ... [b]y herself. So I told McBride, I said, "You go back and stay with Shields and remind her that she is not supposed to talk to anybody."

When asked what Corporal McBride then did, Younkers stated:

> Well, he looked at me kind of funny, and he said, you know, "Can we do that?" And I said, "Yes, we can do it, and that's an order. Get out of here." And, you know, he went and did it.

The uncontradicted testimony of Younkers, corroborated by that of Corporal Shields, is that Corporal Shields had stated to Younkers her desire not to talk with anyone until she had the advice of an attorney, and that she had requested that a specific attorney be contacted to meet her at the homicide division. Younkers legitimately attempted to assist her with that request, and to insulate her from questions from the neighbors, press, or anyone else until she had an opportunity to talk with her attorney. In context, the evidence does not

suggest that Younkers displayed any lack of loyalty toward the department, or was in any manner attempting to interfere with a legitimate investigation. Viewed as a whole, the record lacks substantial evidence to support the findings of violations of the personnel code or police regulations on this occasion. We shall therefore direct that the findings of violations with respect to the incident of 11 February 1989 be reversed; that the sanctions imposed be vacated; and, that the matter be remanded to the Chief of Police for Prince George's County for consideration of appropriate sanction in light of the finding that has been affirmed.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR REVERSAL OF DETERMINATION OF VIOLATIONS ARISING OUT OF THE INCIDENT OF 11 FEBRUARY 1989, FOR VACATION OF THE SANCTIONS, AND FOR REMAND TO THE CHIEF OF POLICE OF PRINCE GEORGE'S COUNTY FOR CONSIDERATION OF APPROPRIATE DISCIPLINARY ACTION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.