James P. Sullivan v. Connecticut Mutual Life Insurance Company, Defendant, and S. L. Morton, Appellant.—88 S. W. (2d) 167.

Division One, November 12, 1935.*

---

*NOTE: Opinion filed at the May Term. 1935, June 25. 1935; motion for rehearing overruled July 30. 1935: motion to transfer to Court en Banc filed; motion overruled at September Term, November 12, 1935.

*Jones, Hocker, Sullivan & Gladney* for appellant.

1086

*Cullen, Fauntleroy & Edwards* for respondent.

FRANK, J.—This case came to the writer on reassignment. Respondent, Sullivan, sued the Connecticut Mutual Life Insurance

Company and S. L. Morton for libel. The verdict of the jury was in favor of the insurance company and against Morton for $10,000 actual and $15,000 exemplary damages. On motion for new trial a *remittitur* of $5000 exemplary damages was made, and judgment for $20,000 was rendered against defendant, Morton, from which he appealed.

During the times in question plaintiff, Sullivan, was general agent for the Lincoln National Life Insurance Company of Ft. Wayne, Indiana, and was operating in the city of St. Louis and vicinity. Defendant, Morton, was general agent for the Connecticut Mutual Life Insurance Company and was operating in the same territory. The gist of the alleged libel is that defendant accused plaintiff of "twisting" and "rebating." The alleged libel is based upon certain parts of a letter written by defendant to one C. L. Dern, manager of agencies for the Lincoln National Life Insurance Company at Ft. Wayne, Indiana. That part of the letter reads as follows:

"The facts are the cases I have already written you about have been twisted into your company. These are just a partial list of the flagrant cases which we have.

"Mr. Sullivan paid me a rather lengthy call the other day at which time he made no attempt to justify any of the twisting that he is advocating. Mr. Sullivan personally twisted out fifty thousand dollars insurance with me on Mr. Harry M. Orwig at which time, according to a signed statement which I have in my possession, he was paying a monthly premium which was one-twelfth of the annual premium, which amounts to rebating."

It is plaintiff's theory that the word "twisting" means and is understood by persons engaged in the insurance business and the public generally to mean the inducing of a person *by fraud and misrepresentation* to drop a policy of insurance already in force in a company other than that of the twisting agent for one in the twisting agent's company.

Defendant concedes that the word "twisting" as applied to insurance means to induce a person to drop a policy of insurance already in force in a company other than that of the twisting agent, for one in the twisting agent's company, but contends that it does not include the element of fraud and misrepresentation, and that insurance people generally so understand it.

Otherwise stated plaintiff's position is that to accuse an insurance agent of twisting means to accuse him of practicing fraud, misrepresentation and trickery in the conduct of his insurance business; that persons engaged in the life insurance business and the public generally so understand it, and for that reason such an accusation when written or printed is libelous.

The petition is not attacked. It sufficiently presents plaintiff's theory of the case. Defendant's answer, after making certain ad-

1088

missions, pleads (1) a general denial, (2) that the letter in question was qualifiedly privileged, and (3) that said letter was true.

Plaintiff offered witnesses who testified that people engaged in the life insurance business generally understood that the word "twisting" includes the element of fraud and misrepresentation. Defendant offered witnesses who testified to the contrary. We need not discuss this evidence or determine the meaning of the word "twisting" because, as we read the record, plaintiff offered documentary evidence, which, in our judgment, shows as a matter of law, that he was guilty of misrepresentation in the conduct of his insurance business. Plaintiff offered in evidence a written document which he testified contained the proposal which he made to prospective customers. That written proposal reads, in part, as follows:

"It must be remembered at all times that cash values arise in the usual life Insurance Contract solely as result of the payment of premiums by the Insured.

"In the case in question, the present cash value of the policy and the dividend, both withdrawable now upon surrender of the policy, is $20,208.00. If the premiums required are paid on said policy for three more years, the total value withdrawable, including the last dividend, will be $30,314.00. That will be an increase in cash value during the next three years of $10,106.00. That increase in cash value arises as the result of two things:—

"First: The payment of three premiums, as follows: $2702.00 now; $2656.50 a year from now; and $2609.50 two years from now; a total of $7968.00.

"Second: A small increase of $2138.00 on account of interest in three years on the present surrender value of $20,208.00.

"We do not maintain, or argue that cash values should not be accumulated. On the other hand, we believe, absolutely, that they should be accumulated; but we do maintain and argue that they can be accumulated by the Insured to his far greater advantage on a different plan than the above described life insurance plan.

"Our plan, of course, requires the disbursement of the same amount of cash, annually, by the Insured as he is forced to disburse annually under the present policy plan; but our plan provides for the disbursement of this annual sum to two separate and distinct institutions; The Lincoln National Life Insurance Company for the Insurance, and The Franklin-American Trust Company for the cash value; instead of disbursing all of the money to one institution, namely the Life Insurance Company, as under the present plan.

"Our plan is, as follows:—

"There is $2702.00 now to be disbursed on the present plan. Instead of sending it to the Life Insurance Company, divide it into two parts; send $813.24 to The Lincoln National Life Insurance Company, and send $1888.76 to the Franklin-American Trust Com-

pany. At the same time, surrender the present policy for $20,208.00 cash and send that cash to The Franklin-American Trust Company.

"This will place $22,096.76 immediately in the hands of The Franklin-American Trust Company. The Trust Company invests it and compounds interest on it semi-annually. The best trust companies in St. Louis have, for years, been earning 5.2% net on trust funds. 5/.2% compounded semi-annually is the equivalent of 5.28% annually. For the purpose of these figures, we will consider earnings at 5/.25%.

"The amount in the trust company now will earn, during the coming year at 5/.25%, the sum of $1160.07, which, added to the principal, will make a total in the trust, at the end of one year from this date, $23,256.83.

"A year from now, there is another premium due. If it were being paid on the present policy, it would amount to $2656.50. Instead of being paid that way, however, $813.24 should be paid to The Lincoln National Life Insurance Company and the balance of $1843.26 should be paid to The Franklin-American Trust Company to be added to the trust. This will make a total in the trust, at the beginning of the second year, of $25,100.09, which, during the second year, will earn $1317.75; making a total in the hands of the trust company, at the end of the second year, of $26,417.84.

"Two years from now, the third premium on the life insurance policy will be due, and if it were all paid on the present policy, it would mean the sum of $2609.50 sent to the Life Insurance Company. However, instead of sending it all to the Life Insurance Company, $813.24 should be sent to The Lincoln National Life Insurance Company, and the balance of $1796.26 should be sent to The Franklin-American Trust Company to be added to the trust. This will make a total in the hands of the trust company, at the beginning of the third year, of $28,214.10, which will, during the third year, earn $1481.23; making a total in the hands of the trust company, at the end of the third year, of $29,695.33.

"Now then, considering only the matter of cash values, the Insured can, as above stated, if he retains his present policy and makes his payments in full to the life insurance company, surrender his policy three years from now for a total of $30,314.00.

"On the same basis, if he wants to have his total cash values in hand at the end of three years from now, he can surrender The Lincoln policy for $596.00; turn that sum over to The Franklin-American Trust Company and have a total trust of $30,291.33, which is $22.67 less than the cash value of the present policy three years from now.

"For the purpose of the argument, it will be admitted that the total cash on hand, either in the hands of the life insurance company,

three years from now, or in the hands of The Franklin-American Trust Company, three years from now, is the same amount.

"How Then Does Our Plan Benefit the Insured?

"Why Should He Adopt Our Plan Rather Than the Plan He Now Has?

"The man who buys a high reserve life insurance policy with the idea that it is not only life insurance protection for beneficiaries, but also a cash emergency accumulation is sure to find out just what kind of an unfortunate emergency fund it is, as soon as he borrows, or thinks of borrowing money on his policy.

"Presume, for instance, a case of a man with $100,000 of life insurance in which he has accumulated, solely by reason of extra payments made by himself over and above the actual cost of the life insurance; a cash value, The So-Called Emergency Fund, of $25,-000.00.

"The emergency comes and he considers the proposition of using the $25,000.00, which he accumulated, for the emergency, and he finds that he is up against the following conditions:

"First. He saved the money; it is his own extra payments which he did not have to pay if he wanted only life insurance, but which he did pay because he wanted an emergency savings fund. In spite of the fact that it is his own savings, he finds that if he wants to use it without paying interest for it in the same way that he would use any other kind of True savings, he must surrender his life insurance policy and rob his beneficiaries of all protection.

"Second. He finds that it would be impossible to draw down the $25,000 and use it without paying interest for it, and still keep $75,000 of protection, even though he were willing to pay the premium on $100,000.00 in order to get protection of $75,000.00.

"Third. He finds that if he wants to keep a part of the protection for his beneficiaries, he must go through the process of borrowing his own money; he must pay 6 per cent interest for it, or $1500.00 a year.

"Fourth. Following this process out, he finds that if he borrows the money, he must continue to pay the premium on the original $100,000.00 of life insurance, which will amount to, say, $2500.00; he must pay $1500.00 interest; making a total payment to the company, each year, of $4000.00; in return for which he is preserving $75,000.00 of insurance to his beneficiaries.

"Fifth. In short, he finds that, although he thought he was paying $25.00 per thousand for protection before he made the loan, he is, as a matter of fact, if he makes the loan, paying $4000.00 for $75,000.00 of protection, or $53.66 per thousand. The process of making the loan in emergency to use his own money, he has increased the price of his insurance from $25.00 per thousand to $53.66 per thousand.

"Sixth. He realizes that, while the loan is outstanding, he has $75,000.00 of protection; he realizes that when he is through using the $25,000.00 of savings, he can pay that $25,000.00 back to the life insurance company and increase his protection from $75,000.00 to $100,000.00—in other words, when he gets through using his money and pays off his loan, he is buying $25,000.00 of protection for beneficiaries at a single premium of $25,000. It is hard to see how insurance could cost more than that.

"It is for the Reasons Above Stated That the Experience of Life Insurance Companies Is That Only 10% to 15% of Policies Which are Pledged With the Companies as Securities for Loans are Ever Redeemed by the Borrowers; Whereas, Over 90% of the First Class Securities Collateraled with Banks for Regular Bank Loans are Redeemed by the Borrowers.

"Once the Holder of a Life Insurance Policy Gets Up Against the Proposition of Using the Emergency Money Which He Has Laid Up in That Policy, He Becomes Disgusted With It as a Form of Collateral."

It appears from the record that plaintiff introduced this written document for the purpose of showing what representations he made to a prospective customer. It is true that plaintiff testified that he did not misrepresent the facts to persons solicited, and H. M. Orwig, the person mentioned in the letter upon which the alleged libel is based, as well as some other persons who bought insurance in plaintiff's company testified to the same thing. However, the testimony of these witnesses is nothing more than their mere opinion and conclusion as to what interpretation should be given the written document which confessedly contains the representations made. The proper interpretation of this written document was a question of law for the court to determine, and under the law could not and should not be left to the mere opinion of lay witnesses and jurors. This brings us to a consideration of the document itself.

This document takes as an example a man who has a $100,000 policy with an annual premium of $2500, in which policy there is a cash value of $25,000. The document represents, in effect, that if this man should borrow $25,000 on his policy, that his protection would then be reduced to $75,000 and that the annual cost of his insurance would be more than doubled. The document arrives at the supposed increase in cost of the insurance by adding $1500 annual interest on the money borrowed to the $2500 annual premium on the policy, making a total annual payment of $4000 then represents that the $4000 annual payment is paid for $75,000 of insurance thereby increasing the cost of his insurance from $25 per thousand to $53.66 per thousand. It is difficult to understand how the $2500 premium, standing alone, will purchase $100,000 of insurance but when added to the $1500 interest payment it will then purchase

only $75,000 of insurance. There can be but one answer to this juggling of figures. It is not true, but it is calculated to mislead and deceive one not accustomed to analyzing figures. The loan does not decrease the amount of the policy nor increase the cost of the insurance. Conceding for the sake of argument that there is only $75,000 protection vouchsafed to the beneficiary so long as the $25,000 loan remains outstanding, the representation that the policyholder pays $4000 per annum for $75,000 protection is incorrect, untrue and misleading. It is true that he pays the company $4000 per year, but $2500 of that $4000 pays for $100,000 insurance, and the remaining $1500 is interest for the use of the loan. There is another subtle deception in connection with this representation, and that is, that it leaves out of consideration entirely the $25,000 which was borrowed and treats that amount as though it were completely and wholly lost to both policyholder and beneficiary.

A study of other parts of the written proposal not heretofore set out shows that plaintiff's proposal to this man would be for him to obtain the $25,000 cash value of his $100,000 policy by surrendering the policy, place the $25,000 in the Franklin-American Trust Company of St. Louis at interest, take out a straight life policy for $75,000 in plaintiff's company, and thereafter annually deposit in the trust company an amount equal to the difference between the premium on the $75,000 policy and the premium he formerly paid on the $100,000 policy, then in case of his death his beneficiary would get the $75,000 of insurance plus the amount in the trust company which would always total more than the $100,000.

In recommending the alleged merits of plaintiff's proposed plan, he represents that the $25,000 cash obtained from surrendering the old policy belongs to the beneficiary and in event of the policyholder's death the beneficiary would get the $75,000 insurance which plaintiff proposes to write, plus the $25,000 cash value of the old policy with interest, making in all more than $100,000. In pointing out what will happen if the supposed policyholder refuses to accept plaintiff's proposed plan but keeps his old policy and borrows the cash value of $25,000 thereon, plaintiff represents that the beneficiary's protection is reduced from $100,000 to $75,000 where it remains unless the loan of $25,000 is paid off by the policyholder during his lifetime.

The fact is that the $25,000 loan does not reduce the face of the policy. In event of the policyholder's death without the loan being paid, there would be $100,000 insurance out of which the $25,000 loan would be paid leaving the beneficiary only $75,000 insurance. But if we should add the $25,000 cash value of the old policy which was borrowed, to the $75,000 insurance, as plaintiff does in representing his plan, the beneficiary would then have $100,000, the same amount which plaintiff represents the beneficiary would receive under his proposed plan.

The facts are that the $25,000 cash would belong to the policyholder and not the beneficiary whether obtained by surrendering the old policy for its cash value, or by keeping the old policy and borrowing the cash value thereon. The $25,000 is the cash value of the old policy. Under either plan it comes from the same source and should be treated the same in representing what the beneficiary would receive under either plan. While the $25,000 cash value of the old policy would belong to the policyholder, he could preserve it for his beneficiary if he so desired. If plaintiff should say that his purpose was not to represent that the $25,000 cash value of the old policy would actually belong to beneficiary, but to represent what the policyholder could do under his plan if he so desired, then he should be fair with his prospect and represent to him that if he keeps his old policy and obtains its $25,000 cash value by a loan on the policy, that he could preserve that $25,000 for his beneficiary if he so desired. That he did not do. It was manifestly unfair, misleading and deceptive to represent that the beneficiary would get the $25,000 cash value of the old policy under plaintiff's plan, but would not get it under the other plan.

Plaintiff admitted that he explained his plan to H. M. Orwig and others. Orwig testifying for plaintiff, said that he canceled a fifty thousand dollar policy which he held in the Connecticut Mutual, and about the same amount in the Northwestern Mutual, and replaced them in the Lincoln National, the company represented by plaintiff. The written document which plaintiff himself introduced in evidence confessedly shows the representations which plaintiff made to Orwig and others. The construction of that written document being a question for the court to determine, for reasons heretofore stated, we hold that it established, as a matter of law, that plaintiff was guilty of misrepresentation of facts in twisting policies from one company to another. The truth of the alleged libelous accusation that plaintiff was a twister being established by plaintiff's own evidence, he is not entitled to recover any damages because of said accusation.

It is claimed that the alleged libelous letter accused plaintiff of rebating. The pertinent parts of the letter read as follows:

"Mr. Sullivan personally twisted out $50,000 insurance with me on Mr. Harry M. Orwig, at which time according to a signed statement, which I have in my possession, he was paying a monthly premium, which was one-twelfth of the annual premium, which amounts to rebating."

It seems to have been the theory of defendant at the time he wrote the letter in question that failure to charge interest on deferred payments of a full annual premium amounted to rebating. Section 5729, Revised Statutes 1929, defines what acts constitute rebating and failure to charge interest on deferred premium payments is not included in that statutory definition. The pertinent part of that statute reads as follows:

"No life insurance company doing business in this state shall make or permit any distinction or discrimination in favor of individuals between insurants (the insured) of the same class and equal expectations of life in the amount or payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contracts it makes; nor shall any such company, or agent thereof, make any contract of insurance or agreement as to such contract other than as plainly expressed in the policy issued thereon; nor shall any such company, or any officer, agent, solicitor or representative thereof, pay, allow or give, or offer to pay, allow or give, directly or indirectly, as inducement to insurance, any rebate of premium payable on the policy. . . ."

It is apparent from a reading of this statute that it does not prohibit the payment of a full annual premium in twelve equal monthly installments. Neither does this nor any other statute require the payment of interest on deferred installment payments on an annual premium, or provide that the failure to charge interest on such payments shall amount to rebating. ▇ If defendant had charged plaintiff with rebating without giving the facts upon which such charge was based, then the charge would have been libelous because rebating is a violation of law. But where, as here, the alleged libelous letter charged that plaintiff permitted a policyholder to pay monthly one-twelfth of the annual premium, which amounted to rebating, when, in fact, it did not amount to rebating, the letter does not charge a violation of the statute, and the facts upon which the charge is based are stated in such plain and unambiguous language that the letter is not calculated to cause the average lay reader to believe that it charged respondent with a violation of the rebating statute. For these reasons, it is not libelous. We so declared the law in Trimble v. Foster, 87 Mo. 49, 52. We there said:

"If words spoken amount, of themselves, to a charge of larceny. yet *if accompanied* with a *specification of acts upon which the charge is based*, which *show that no crime* was *committed*, the party of whom the words were spoken has *no cause of action*. As, if the words relate to the taking of property not a subject of larceny, they will not be actionable."

Where the statute defines rebating. it is not a matter of proof as to what constitutes rebating, but the court should determine whether or not the evidence makes out a prima facie case of rebating under the statute.

Our conclusion is that the trial court erred in not sustaining defendant's demurrer to the evidence on both branches of the case. For that reason the judgment should be reversed. It is so ordered. All concur, except *Coles, J.,* not sitting.

## On Motion for Rehearing.

FRANK, J.—The opinion in this case holds that the written document introduced in evidence by plaintiff showed, as a matter of law, that plaintiff was guilty of twisting in the sense in which his petition characterized the word "twisting"—that is—that he was guilty of misrepresentation of facts in twisting policies from one company to another.

Respondent contends that the written document in question did not conclusively show that he was guilty of misrepresentation of facts, and that we erred in so holding. We do not agree with respondent's contention, and therefore adhere to the ruling made in our former opinion for the reasons there given.

Further contention is made that the truth of the charges contained in the alleged libelous letter was not alleged as a defense or in mitigation or otherwise, and for that reason it was not an issue in the case.

We cannot agree with this contention. The gist of plaintiff's petition is that the word twisting includes fraudulent misrepresentations, and that the alleged libelous letter falsely charged plaintiff with fraudulent misrepresentation of facts by referring to him in said letter as a twister. It was necessary for plaintiff in order to make a case for the jury to show, prima facie, that the charge contained in said letter was false. Plaintiff not only failed to establish, prima facie, that the charge was false, but on the contrary he introduced written evidence which, in our judgment, conclusively established that the charge was true. If plaintiff had not established the truth of the charge by his own evidence, then the burden would have been on defendant to plead and prove the truth of the charge if he sought to invoke it as a defense. But where, as in this case, the truth of the charge is established by plaintiff's own evidence, it defeats his right to recover notwithstanding the fact that defendant did not plead the truth of the charge as a defense. The courts so hold. In Kersting v. White, 107 Mo. App. 265, 281, 80 S. W. 730, the plaintiff sought to recover damages for an alleged slander. In deciding the case that court, among other things, said:

"There was no allegation in the answer that the communication was a qualifiedly privileged one, hence the defendant could not interpose that as a defense. But if plaintiff by her own evidence conclusively showed the communication was a qualifiedly privileged one and offered no proof whatever of express malice then the court should have nonsuited her, notwithstanding the failure of defendant to plead his privilege."

This rule announces no new doctrine. For example, in negligence cases where contributory negligence appears from plaintiff's own evi-

dence, no case is made notwithstanding the defendant's failure to plead contributory negligence as a defense.

Plaintiff's argument in support of this contention is, (1) that the truth of the charge was not pleaded as a defense, and (2) that defendant expressly stated in the court below and in this court that the truth or falsity of the representations made by plaintiff was not an issue in the case. From these premises it is strenuously contended that our opinion decides the case on an issue not presented, and is, therefore, a complete and total departure from the theory upon which the case was tried below.

We recognize the rule that, on appeal, parties are bound by the theory upon which the case was tried below, but we are not convinced that our opinion is a departure from that rule. Plaintiff's petition alleged that the charge of twisting leveled against him in the alleged libelous letter was false. Defendant's answer contained, among other things, a general denial. The writing of the alleged libelous letter by defendant was admitted. Plaintiff offered evidence tending to prove that the word "twisting" means to induce a person by misrepresentation or trickery, to drop a policy already in force in a company other than that of the twisting agent for one in the twisting agent's company, and that people engaged in the life insurance business so understand it. If plaintiff had stopped at this point he would have made a case for the jury and the burden would then have been upon defendant to plead and prove the truth of the charge. But when plaintiff went a step farther and conclusively established the truth of the charge by documentary evidence, he carried the burden for defendant and thereby destroyed his own case. For these reasons the demurrer tendered at the close of all the evidence should have been sustained.

Answering the contention that defendant's counsel expressly stated in the court below and in this court that the truth or falsity of the representations made by plaintiff was not an issue in the case, it may be said that issues are not made by mere statement of counsel. Besides, where, as in this case, the plaintiff's own evidence conclusively shows he has no right to recover, the position taken by defendant becomes immaterial.

It is contended that our holding that the alleged charge of rebating is not libelous is in conflict with prior decisions of this court.

In support of this contention our attention is called to Seested v. Post Printing and Publishing Co., 326 Mo. 559, 573, 31 S. W. (2d) 1045, and kindred cases holding that although an alleged libelous article does not charge the commission of a crime or the violation of a law, yet, if it be couched in such language that its probable effect would be to cause the average lay reader to believe that a violation of law was charged, the article is libelous. The cited cases correctly declare the law. Our original opinion does hold that the alleged

charge of rebating was not libelous because it did not charge a violation of the rebating statute. We are also of the opinion that the charge is not calculated to cause the average lay reader to believe that the letter charged respondent with a violation of the rebating statute, because the facts upon which the charge is based are stated in such plain and unambiguous language, that the average lay reader should not be misled thereby.

To the extent of this latter holding, our original opinion should be and is modified.

For the reasons stated, the motion for rehearing should be overruled. It is so ordered. All concur, except *Coles, J.,* not sitting.