692 A.2d 474

**INSURANCE COMMISSIONER FOR THE STATE of Maryland**

v.

**Steven E. ENGELMAN, t/a Professional Bail Bonds, Inc., et al.**

No. 144, Sept. Term, 1995.

Court of Appeals of Maryland.

April 17, 1997

**404**

Evelyn O. Cannon, Assistant Attorney General (J. Jospeh Curran, Jr., Attorney General; Joy Y. Hatchette, Assistant Attorney General, on brief), Baltimore, for Petitioner.

Andrew Jay Graham (Geoffrey H. Genth, Kramon & Graham, P.A., on brief), Baltimore, for Respondent.

Argued before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

We are principally called upon in this case to review the propriety of an administrative enforcement proceeding

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

brought under the Maryland Insurance Code ("the Code"), Maryland Code (1957, 1991 Repl.Vol., 1992 Cum.Supp.), Article 48A, §§ 1–697.[1] We are asked whether the Maryland Insurance Administration ("the MIA") may prohibit, by adjudication, bail bondsmen from accepting installment payments on bond premiums [2] when their surety's approved rate filings [3] neither permit nor prohibit such activity. For the reasons explained below, we shall answer that question in the negative and affirm the judgment of the circuit court. Because this case results from the consolidation on judicial review of two separate administrative actions, we shall recount the facts relevant to each Respondent *seriatim*.

## I.

### a. Engelman

Steven E. Engelman [4] began operating a bail bonding company known as Professional Bail bonds on October 22, 1992. Engelman subsequently incorporated the entity as Professional Bail Bonds, Inc. ("Professional"), which began issuing bonds in its own name in January of 1993.

---

1. All future statutory references in this opinion will be to Md.Code (1957, 1991 Repl.Vol., 1992 Cum.Supp.), Art. 48A, §§ 1–697, unless otherwise indicated.

2. This practice is colloquially known as accepting "short money." For example, if a defendant is required to post a $10,000 bond with the court, the bond premium may be 10%, or $1000. Often, the bond purchaser, either a relative or friend of the defendant, is unable to immediately pay the entire premium and will arrange to pay a portion of the premium "up front" and the remainder within a specified period of time, usually sixty to ninety days.

3. A "rate filing" is a statutory mandate requiring insurers to publicly file and justify their rates with the Insurance Commissioner by the date they become effective. *See* Md.Code (1957, 1991 Repl.Vol., 1992 Cum. Supp.), Art. 48A, § 242(c)(1)–(2) & (d); *GEICO v. Insurance Commissioner*, 332 Md. 124, 127, nn. 1–2, 630 A.2d 713, 714, nn. 1–2 (1993).

4. The Maryland Insurance Administration issued Engelman a Certificate of Qualification to act as a bail bondsman in January of 1989.

In March of that same year, Sandra Castagna, Senior Market Conduct Examiner for the MIA, and William McGarvey, a Market Conduct Examiner for that same organization, performed an examination of Professional's business activities as well as those of Engelman, for the period November 1, 1992 through February 28, 1993. By a letter dated April 19, 1993,[5] Castagna informed Engelman of the March examination results, questioning a $12,766.25 discrepancy between insurance premiums charged and premiums actually collected. Castagna also informed Engelman that "Professional" was not a registered trade name and that the corporation was not on record as having a Certificate of Qualification as required by § 168(e)(2) of the Code.

On April 22, 1993, Engelman responded to Castagna's letter, averring that he had registered Professional as a trade name and completed the corporation's Certificate of Qualification and was filing it that same day. Unsure of the alleged discrepancy period, however, Engelman requested further information so that he could adequately respond. Within six days, Engelman's father, who also was his accountant, in-

---

**5.** Recreated in pertinent part, the letter reads as follows:
"Dear Mr. Engleman: [sic]
Pursuant to our examination of your agency, the following questions need to be answered.

| | | |
|---|---|---|
| 1) | Total Premiums Written: | $180,554.50 |
| 2) | Total Premiums Deposited: | $167,788.25 |
| | Difference: | $ 12,766.25 |

Please explain why there is a discrepancy between the two figures.
2) After checking our trade name records, we cannot find a registration for Professional Bail Bonds. If you have registered this trade name, please send copies of the application and your canceled check. If not, an application is enclosed.
3) Section 168(e)(1) of the Code states that an agent doing business as a corporation must license the corporation. (copy enclosed) Please explain why Professional Bail Bonds, Inc. has not obtained a certificate of qualification.
Also enclosed is a copy of the bail bond regulations we discussed.
Thank you for your continued cooperation in this matter. A written response is expected within (10) days of receipt of this letter. After reviewing your response, we will discuss an administrative settlement that will conclude our examination."

formed Castagna by letter that, with respect to the discrepancy between premiums charged and premiums collected,

> "there are numerous situations where premiums are not paid in full because of broken promises, bad checks and the bad credit of essentially indigent persons who make up the bulk of his clientelle. [sic] At the time of these shortfalls, Steven [Engelman] provides his client with a written receipt and obtains a promissory note for the balance due. Steve keeps a record of these balances due but in time, many of these receivables go on to becoming write offs . . ."

Following its investigation, the MIA alleged, *inter alia*, that by failing to collect bond premiums in full at the time the bonds were written, Engelman violated §§ 226(a), 230(b), and 242(e) of the Code, discussed further beginning in Part III, *infra.* The MIA also charged Engelman with violations of § 168(e)–(f),[6] for failing to timely acquire a Certificate of Qualification and for failing to timely register Professional's trade name with the agency.

At a hearing held before an Administrative Law Judge ("ALJ") of the Office of Administrative Hearings,[7] Engelman

---

**6.** Section 168(e) provides:

"(e) *Partnership or corporation.*—(1) A partnership or corporation may not accept in its own name commissions, fees, or other compensation for acting as an agent or broker unless it possesses a certificate of qualification for the particular kind of or kinds of insurance or subdivisions thereof for which it acts as agent or broker and an appointment for the kind or kinds of insurance or subdivisions thereof for which it acts as agent or broker."
Section 168(f) provides:
"(f) *Filing of addresses and agency or trade names.*—The Commissioner shall require, and every agent and broker shall file with the commissioner, in such form as he may direct, with the fee prescribed in § 41 of this article the agency or trade names to be used and the business address and the name and residence addresses of each individual possessing a certificate of qualification who does business under that agency or trade name."

**7.** Section 35(2) of the Code requires the Commissioner to hold a hearing

"upon the written demand therefor by a person aggrieved by any act, threatened act or failure of the Commissioner to act, or by any report, rule, regulation or order of the Commissioner . . ."

stipulated that from November 1, 1992 to February 28, 1993, he and his employees had accepted less than the full premium for thirty-five issued bonds, although the balance of the premiums due had been secured by promissory notes. The sureties underwriting the bonds did not have a rate filing permitting installment payments. Engelman also conceded that he did not register Professional's trade name until April 20, 1993— almost five months beyond the date it began issuing bonds and collecting premiums in its own name. The ALJ recommended granting Engelman's Motion for Summary Decision on the installment payment issue, concluding that none of the cited statutes prohibited the practice. The ALJ did, however, conclude that Engelman's failure to comply with § 168(e)–(f) warranted a three-day suspension under § 175(12).[8]

On March 8, 1995, the Insurance Commissioner ("Commissioner") rejected the ALJ's conclusions of law with respect to installment payments, concluding that "[they] ... plainly constitute[ ] a 'special favor ... benefit ... or valuable consideration' as those terms are used in § 226(a) of Article 48A," and that § 230(b) prohibited the collection of partial premiums.

---

Pursuant to Md.Code (1984, 1995 Repl.Vol., 1996 Supp.), § 10–205(a)(ii) of the State Government Article, the Commissioner has "delegate[d] to the Office [of Administrative Hearings] the authority that the [Commissioner] ... has to hear particular contested cases."

8. **Section 175—Grounds for refusal, suspension or revocation of certificate**, provides the grounds upon which an insurance certificate may be suspended. The provisions pertinent to this opinion provide:

"An original application for a certificate may be refused until the Commissioner is satisfied under the provisions of §§ 35–39 that the applicant is not guilty of violating any provisions of this section. A certificate duly issued may be suspended or revoked or the renewal thereof refused by the Commissioner if he finds, after notice and hearing in accordance with the provisions of §§ 35–39, that the applicant for, or holder of such certificate:

(1) Has wilfully violated any provision of this article or of any other law of this State relating to insurance as herein defined, or relating to another type of insurance; or ...

(6) Has committed fraudulent or dishonest practices in the business of insurance; or ...

(12) Has otherwise shown lack of trustworthiness or lack of competence to act as agent or broker ...."

The Commissioner imposed a thirty-day suspension for the totality of Engelman's alleged violations. Engelman then sought judicial review in the Circuit Court for Baltimore City.

### b. Wynder

After an initial hearing before the Associate Deputy Insurance Commissioner ("ADC"), Respondent Wynder was found to have violated various provisions of Art. 48A for concededly collecting bond premiums in installments. Wynder sought judicial review of the ADC's Order in the Circuit Court for Baltimore City, which remanded the case for a *de novo* hearing. The ALJ assigned to hear Wynder's case delayed his ruling pending the Engelman decision. On April 17, 1995, Wynder received a recommended suspension of sixty days under § 175(1), (6), and (12), *see* n. 6 *supra*, which the Commissioner adopted in a Final Order, dated April 21, 1995. Wynder once again sought judicial review in the Circuit Court for Baltimore City.

### II.

Engelman and Wynder's cases were consolidated on judicial review. The circuit court reversed Respondents' suspensions for accepting "short money." In its Memorandum Opinion and Order, the court ruled that "installment plans, with or without interest, are permitted under the [Insurance] Code, and do not constitute a 'valuable consideration' given in exchange for the purchase of the bond [within the meaning of § 226(a)]." The court further concluded that even assuming that the Commissioner himself prohibited the practice of accepting "short money," that policy was unknown and unknowable to Engelman and Wynder and fairness dictated that the Commissioner adopt a specific rule prohibiting the practice.

The court, however, affirmed Engelman's suspension for failing to register and qualify Professional in a timely manner, but remanded the case so that the Commissioner could consider what portion of Engelman's suspension was attributable to his registration and qualification failures. The Commissioner

appealed that judgment to the Court of Special Appeals. Engelman filed a cross-appeal. We granted a writ of certiorari in both cases before argument in the intermediate appellate court to consider the issues raised.

## III.

■ Ordinarily, a final order of the Commissioner must be upheld on judicial review if it is legally correct and reasonably supported by the evidentiary record. *Montgomery County v. Buckman*, 333 Md. 516, 519, 636 A.2d 448, 450 (1994); *Younkers v. Prince George's County*, 333 Md. 14, 18–19, 633 A.2d 861, 862–63 (1993). This standard of review is both narrow and expansive. It is narrow to the extent that reviewing courts, out of deference to agency expertise, are required to affirm an agency's findings of fact, as well as its application of law to those facts, if reasonably supported by the administrative record, viewed as a whole. *United Parcel Service v. People's Counsel*, 336 Md. 569, 577, 650 A.2d 226, 230 (1994); *Supervisor v. Asbury Methodist Home*, 313 Md. 614, 625–27, 547 A.2d 190, 195–96 (1988); *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 513, 390 A.2d 1119, 1124 (1978). The standard is equally broad to the extent that reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law. *United Parcel Service*, 336 Md. at 577, 650 A.2d at 230; *Baltimore Lutheran High Sch. Ass'n v. Employment Security Admin.*, 302 Md. 649, 662, 490 A.2d 701, 708 (1985).

The fact that both Engelman and Wynder secured bond premiums with promissory notes or otherwise extended credit to their customers is undisputed. Therefore, the only remaining question is whether that practice is proscribed by the Insurance Code when not part of an approved rate filing.

## IV.

Leaning on the oft quoted principles of statutory construction, *see generally Kaczorowski v. Mayor*, 309 Md. 505, 515, 525 A.2d 628, 632–33 (1987), the Commissioner maintains that

when read together, the package of Code provisions addressing the regulation of rate filings compels the conclusion that installment payments are prohibited if not part of an approved rate filing. Specifically, the Commissioner points to §§ 226(a), 230(b) and 242(e) of the Code. They provide in pertinent part:

"**§ 226. Unfair discrimination and rebates—Property, casualty and surety insurance.**

(a) *Giving of rebates inducement by insurer, agent or broker prohibited.*—No insurer or any employee or representative thereof, and no agent or broker shall pay, allow, or give or offer to pay, allow, or give, directly or indirectly, as an inducement to insurance, or after insurance has been effected, any rebate, discount, abatement, credit, or reduction of the premium named in the policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever, not specified in the policy, except to the extent provided for in an applicable filing with the Commissioner as provided by law.

**§ 230. Illegal dealing in premiums; improper charges for insurance; raising policy limits of coverage.**

(b) A person willfully may not collect as premium or charge for insurance any sum in excess of or less than the premium or charge applicable to the insurance, in accordance with the applicable classifications and rates as filed with and approved by the Commissioner; or, in cases where classifications, premiums or rates are not required by this article to be so filed and approved, the premiums and charges shall not be in excess of or less than those specified in the policy and as fixed by the insurer . . .

**§ 242. Property, casualty, surety and marine rating.**

(e) *Use of rates.*—No insurer, officer, agent or representative thereof shall knowingly issue or deliver, or knowingly permit the issuance or delivery of, a policy or insurance, or any endorsement, certificate, or addition to the policy, except in accordance with the filings which are in effect for the insurer as provided in this section or in accordance with

subsection (H) of this section. As compensation for procuring business, any insurer may pay or allow a commission to any licensed agent of the insurer."

## V.

■ One of the principal aims of the above-quoted provisions, and of the entire Code itself, is the prevention of excessive, inadequate, or unfairly discriminatory insurance rates. § 241. To that end, the practice of rebating was identified by the General Assembly over one hundred years ago as an undesirable custom within the insurance industry resulting in unfair discrimination.[9] Unfair discrimination, as the term is employed by the Insurance Code, means discrimination among insureds of the same class based upon something other than actuarial risk.

■ Rebating occurs when an insurer or its agents offer inducements to insure which are not specified in the policy of insurance. Such practices include, refunding part of the premium or accepting less than the premium specified in the policy, splitting agent commissions with the insured, selling insurance company stocks or bonds discounted by the proposed rebate amount, and raising policy limits beyond that for which was originally contracted and paid. For an excellent discussion of the various forms rebating may take, *see* Kimball and Jackson, *The Regulation of Insurance Marketing,* 61 Colum.L.Rev. 141, 146–149, 187–89 (1961).

■ In effect, rebating undermines rate classifications on file with the Commissioner.[10] When insurers offer insureds within the same rate class different terms on the same insurance product, the rate actually paid by the favored party is something less than that reflected in the insurer's rate filing. Ademec, *Premium Rebating: An Unnecessary Evil,* 39 Fed'n Ins. & Corp. Couns. Q. 3, 5 (1988). State legislatures have

---

**9.** *See* Chapter 254, § 1 of the Acts of 1890.

**10.** *See* note 3, *supra.*

variously targeted this practice primarily to protect insureds from the concentrated power of large insurance concerns with the financial capacity to offer large rebates, from unethical sales practices engaged in by competing agents and a concomitant decrease in service, and from generally discriminatory practices. *Id.* It has also been suggested that anti-rebating statutes were aimed at averting insurance company insolvency, but the response to that suggestion has been that capital surplus and security laws are designed expressly for, and better accomplish, that purpose. *Id.* at 6; *see also* §§ 48–50. Anti-rebating statutes are currently in effect in some form in all fifty states.[11]

Maryland's General Assembly first addressed these issues

---

11. *See* Ala.Code §§ 27–13–38, 27–13–76, 27–14–7, 27–34–46; Alaska Stat. §§ 21.36.100, 21.36.120, 21.66.310, 21.66.340, 21.84.480; Ariz. Rev.Stat. Ann. §§ 20–449, 20–451, 20–1586; Ark.Code Ann. §§ 23–66–206, 23–66–306, 23–66–308; Cal. Insurance Code §§ 1490, 12405, 12640.14; Colo.Rev.Stat. §§ 10–3–1104, 18–13–119.5; Conn. Gen.Stat. § 38a–825; Del.Code Ann. tit. 18, § 2304; Fla. Stat. ch. 626.9541(h); Ga.Code Ann. §§ 33–6–4, 33–9–36; Haw.Rev.Stat. § 431:13–103; Idaho Code §§ 41–1314, 41–2708; Ill.Rev.Stat. ch. 215, para. 5/151, 5/469; Iowa Code §§ 507B.4, 515.130; Kan. Stat. Ann. §§ 40–941, 40–1122, 40–2404; Ky.Rev.Stat. Ann. § 304.12–090; La.Rev.Stat. Ann. § 22:1214; Me.Rev.Stat. Ann. tit. 24–A, §§ 2160, 2162, 2163; Mass. Ann. Laws ch. 175, §§ 182, 183, ch. 176D, § 3; Mich. Stat. Ann. § 24.12024, [M.C.L.A. § 500.2024], § 24.12070, [M.C.L.A. § 500.2070]; Minn.Stat. §§ 72A.08, 72A.12, 72A.20; Miss.Code Ann. §§ 83–3–121, 83–7–3; Mo.Rev.Stat. §§ 375.936, 376.500, 379.356; Mont.Code Ann. §§ 33–18–208, 33–18–210; Nev.Rev.Stat. §§ 686A.110, 686A.130; N.H.Rev.Stat. Ann. §§ 402:39, 402:40, 417:4; N.J. Stat. Ann. §§ 17:29A–15, 17:29AA–14, 17:29B–4, 17:46A–5, 17:46B–35, 17B:30–13; N.M. Stat. Ann. §§ 59A–16–15, 59A–16–17, 59A–16–18; N.Y. Insurance Law §§ 2324, 4224, 6409; N.C. Gen.Stat. §§ 58–33–85, 58–33–90, 58–58–35; N.D. Cent.Code §§ 26.1–04–03, 26.1–04–05, 26.1–04–06, 26.1–25–16; Ohio Rev.Code Ann. §§ 3901.21, 3911.18, 3911.20, 3933.01, 3999.05; Okla. Stat. tit. 36, § 1204; Or.Rev.Stat. §§ 746.035, 746.045; Pa. Stat. Ann. tit. 40, §§ 275, 276, 1171.5; R.I. Gen. Laws §§ 27–1–39, 27–2–23, 27–6–46, 27–8–7, 27–9–44, 27–29–4; S.C.Code Ann. §§ 38–55–50, 38–57–130, 38–57–140; S.D. Codified Laws Ann. §§ 58–33–14, 58–33–24; Tenn.Code Ann. §§ 56–8–104, 56–35–119; Tex. Insurance Code Ann. art. 5.20, 9.30, 21.21; Utah Code Ann. § 31A–23–302; Vt. Stat. Ann. tit. 8, §§ 3702, 3861, 4085, 4724; Va. Code Ann. §§ 38.2–509, 38.2–4614; Wash. Rev.Code §§ 48.30.140, 48.30.170, 48.30A.015; W. Va.Code § 33–11–4; Wis. Stat. § 626.25; Wyo. Stat. §§ 26–13–110, 26–23–322.

in 1890. *See* Chapter 254, § 1 of the Acts of 1890,[12] now codified and as amended in scattered sections of Md.Code (1957, 1994 Repl.Vol., 1996 Supp.), Art. 48A. Section 226(a), one of several antirebating provisions of the Maryland Insurance Code, employs language that closely parallels that of the model Unfair Trade Practices Act adopted by the National Association of Insurance Commissioners ("NAIC") in 1945.[13] As currently amended, the Model Act provides in Section H.(1), entitled "Rebates:"

"Except as otherwise expressly provided by law, knowingly permitting or offering to make or making any life insurance policy or annuity, or accident and health insurance or other insurance, or agreement as to such contract other than as plainly expressed in the policy issued thereon, or paying or allowing, or giving or offering to pay, allow, or give, directly, or indirectly, as inducement to such policy, any rebate of premiums payable on the policy, or any valuable consideration or inducement whatever not specified in the policy; or giving, or selling, or purchasing or offering to give, sell, or purchase as inducement to such policy or annuity or in connection therewith, any stocks, bonds, or other securities of any insurance company or other corporation, association,

---

**12.** Although Chapter 254 of the Acts of 1890 only applied to "life endowment insurance," subsequent acts of the Maryland General Assembly extended the reach of anti-rebating provisions to all insurance.

**13.** The model Unfair Trade Practices Act was adopted by the National Association of Insurance Commissioners in accordance with the McCarran–Ferguson Act, Pub.L. No. 15–79 (1945)(current version at 15 U.S.C. § 1011 *et seq.* (1976 & 1997 Cum.Supp.)). The McCarran–Ferguson Act was a legislative response to *United States v. South–Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which for the first time held that the insurance business is commerce properly subject to federal regulation when conducted across state lines. The act ameliorated public fears that states would be completely precluded from regulating the insurance industry under the holding in *South–Eastern.* In fact, the act gives preemptive authority to states dealing with insurance regulatory issues. Although at the time, state regulation of unfair or discriminatory practices in the insurance industry was "exceedingly spotty," all states employed anti-rebating laws in some form. *See* 1 RICHARDS ON INSURANCE § 51 (5th ed. 1952 & 1968 Cum.Supp.).

or partnership, or any dividends or profits accrued thereon, or anything of value whatsoever not specified in the policy.

Although the Model Act speaks in both general and specific terms (such as a prohibition on the sale of stock or bonds in connection with the sale of insurance), it makes no attempt to exhaustively list those practices that would fall within the purview of the Act. And as some commentators have suggested, such an attempt would be futile. *See* Kimball & Jackson, *supra,* at 186–189. Likewise, § 226(a) makes no attempt to identify any particular practice as rebating. Rather, the statute speaks in broad terms, leaving its outer boundaries undefined.

A hint, however, is provided by § 230(b), which prohibits persons from "willfully ... not collect[ing] as premium or charge for insurance any sum in excess of or less than the premium or charge applicable to the insurance." When considered in light of the purposes of anti-rebating provisions generally, the aim of § 230(b) is clear—it prevents, *inter alia,* insurers and their agents from engaging in "wink and nod" transactions with selected insureds, leaving the latter something less than fully liable for the policy premium reflected in the applicable rate classification. In other words, § 230(b) obliterates any arguable distinction between post-transactional rebating versus waiving policy premiums or any portion thereof in the first instance. The effect of such practices is the same as those generally targeted by § 226(a).

## VI.

The Commissioner contends that because of the time-value of money, by collecting bond premiums without the prior sanction of the Commissioner in an approved rate filing, a bond agent issues a rebate, discount, abatement, credit, inducement or reduction of the bond premium in the purchase of insurance, which is prohibited by § 226(a).[14] Using this same

---

14. For example, if a bondsman issues a $10,000 bond with a $1000 premium and collects $500 up front and the remainder over 60 days,

logic, the Commissioner also maintains that installment arrangements violate § 230(b), which prohibits bondsmen from "willfully [ ] not collect[ing] as premium or charge for insurance any sum in excess of or less than the premium or charge applicable to the insurance, in accordance with the applicable classifications and rates as filed with and approved by the Commissioner. . . ." Finally, the Commissioner asserts that notwithstanding the above two provisions, § 242(e) prevents an insurer or its agents from charging rates "except in accordance with the filings which are in effect for the insurer."

The essence of the Commissioner's position is that unapproved installment plans allow bond agents to unfairly discriminate among individuals in the purchase of insurance. Even though the *insurance rate* may be the same for individuals, the conditions of credit may vary greatly with no articulable basis—a breeding ground for discrimination. Moreover, the extension of credit to bond purchasers necessarily affects the profit and loss expectations of the surety. Respondents counter that the Commissioner's position is unsupported by the Code.

As indicated in Part V., *supra,* § 230(b) prohibits insurers and their agents from "willfully" collecting any sum in excess of, or less than, the premium applicable to the insurance in accordance with the applicable classifications and rates filed with, and approved by, the Commissioner. It says nothing about the method of collection—only that they must be collected in accordance with the applicable rates and classifications for that particular insurance product on file with the Commissioner. The Commissioner's reading of the statute is commercially unrealistic and simply does not square with the practice of many insurers who bill their customers for the entire amount of the premium, payable within thirty days.

---

the remaining $500 necessarily has less economic value than the first $500, and therefore, less than the entire $1000 is collected. Conversely, if a bondsmen charges interest at a rate of 10% of the outstanding balance per month, then at the end of 60 days, more than $1000 is collected.·

Even the simple act of accepting checks on bond premiums would constitute rebating under the Commissioner's view, since those employing this commonly used form of commercial paper would arguably enjoy the use of the funds represented by the check longer than those who secure coverage with cash. Despite the Commissioner's assertions to the contrary, nothing in the Code requires a strict temporal proximity between coverage and actual cash payment.

■ Moreover, the record evidence indicates, and the Commissioner does not suggest otherwise, that Engelman used best efforts to enforce the promissory notes executed in his favor. Engelman's failure to collect certain specified sums was the result of defaults, and thus cannot be said to have been "willful" on his part.

■ Section 242(e) is similarly silent about whether installment payments must be first sanctioned by the Commissioner in an approved rate filing. Once again, the statute only prohibits insurers and their agents from issuing or delivering a policy of insurance "except in accordance with filings which are in effect" for the surety under the rate filing provisions of the Code. Stated otherwise, the only premium that an insurer may charge for a given insurance product is that which has been actuarially justified with the Insurance Commissioner. Section 242(e) compels no conclusion about how those premiums must be paid.

## VII.

■ The inquiry that remains, however, is whether in the final analysis the taking of a promissory note without interest and an indemnification agreement in lieu of cash or its equivalent in partial or full payment of a policy premium constitutes rebating as that term is employed in the Maryland Insurance Code—a question of first impression. We believe that it does not.

Despite the uniform adoption throughout the several states of anti-rebating provisions, there is a paucity of administrative

enforcement actions which have directly addressed the present issue. Rather, the propriety of no-interest loans on insurance premiums in light of anti-rebating provisions has been incidentally raised in other contexts.

For example, Pennsylvania's intermediate appellate court considered the credit/rebate issue in a breach of contract action. *Blouch v. Clifford R. Zinn & Son, Inc.*, 350 Pa.Super. 327, 504 A.2d 862 (1986). In *Blouch*, a widow sought the proceeds of her husbands life insurance policy. Because the insurer's agent extended credit to Mr. Blouch for payment of the first insurance premium, a jury concluded that the insurance agreement was consummated and that the insurer was bound to the terms of the policy. The insurer, however, sought indemnification from its agent for allegedly violating Pennsylvania's anti-rebating statute and for violating the insurer's internal policies prohibiting agent/insured credit arrangements. Although the jury rejected that argument, the trial court granted the insurer's motion for judgment n.o.v. on the indemnity issue.

The agent fared better on appeal. In addressing the matter, the appellate court first noted that (like our own anti-rebating provisions) "the object of [Pennsylvania's anti-rebating statute] is to outlaw unfair treatment of prospective insurance clients of the same class." *Blouch*, 350 Pa.Super. at 331, 504 A.2d at 864. The court pointed out that no violation was apparent since "no testimony was given to demonstrate that Zinn furnished any rebate to [Mr.] Blouch by extending credit to him for the initial premium, or that [the agent] used the extension of credit as an inducement to Blouch." [15] Impor-

---

15. Pennsylvania's intermediate appellate court did acknowledge, however, that when a policy is delivered for inspection with no concomitant premium obligation, enforcement of the policy would constitute a special advantage within the meaning of Pennsylvania's anti-rebating statute. *Blouch v. Clifford R. Zinn & Son, Inc.*, 350 Pa.Super. 327, 332, 504 A.2d 862, 864 (1986) (citing *Katchmer v. Prudential Ins. Co. of America*, 325 Pa. 69, 188 A. 869 (1937)). This view is perfectly consistent with our § 230(b), since enforcement of an insurance policy when an agent has refused to accept the policy premium would clearly violate its provisions.

tantly, the court did not consider credit arrangements violative of the rebating provisions of the Pennsylvania Insurance Code—a code, we note, that employs language similar to our own anti-rebating provisions and that of the model Unfair Trade Practices Act, *see* PA. STAT. ANN. tit. 40, § 275 (1921); *see also* Part V., *supra*, save for a proviso in the Pennsylvania statute that states "[n]othing in this section shall be construed to prevent the taking of a bona fide obligation, with legal interest, in payment of any premium." Although the *Blouch* court failed to reference this language in its holding, we note that prior holdings of the same court weakly suggested, but by no means held, that no-interest loans by insurers to their insureds may violate Pennsylvania's anti-rebating statutes. *Compare Hirsch v. Singer*, 86 Pa.Super. 605, 607–08 (1925); *Ellis v. Anderson*, 49 Pa.Super. 245 (1912). We believe, however, that based on *Blouch*, current Pennsylvania law is otherwise.

A similar result obtained in an action on a promissory note in *Lamar v. Lowery*, 41 Ala.App. 166, 124 So.2d 834 (1960). In *Lamar*, the purchaser of a life insurance policy executed a note in favor of the insurer's agent in lieu of cash for the policy's initial premium. The note was subsequently endorsed to the insurer. No payment was made upon the note. The Court of Appeals of Alabama rejected the insured's defense that the acceptance of an interest bearing promissory note for an initial insurance premium constitutes rebating under then Section 75, Title 28 of the Alabama Insurance Code rendering the holder other than one in due course. Again, the language employed in that code closely paralleled the language of the codes cited *supra*, and Maryland's own § 226(a). *Lamar*, 41 Ala.App. at 168, 124 So.2d at 836; *accord MacDonald v. Calkins*, 31 Ariz. 161, 251 P. 458 (1926); *Indemnity Ins. Co. of N. America v. Watson*, 128 Cal. Dist. Ct.App. 10, 19–20, 128 Cal.App. 10, 16 P.2d 760, 764 (1933); *Northern Assurance Co. v. Meyer*, 194 Mich. 371, 378, 160 N.W. 617, 619 (1916); *McGee v. Felter*, 75 Misc. 349, 354–55, 135 N.Y.S. 267, 271 (1912); *McDonald & Frazier v. Schervish*, 6 Ohio App. 88 (1916). *See also* 14 APPLEMAN, INSURANCE LAW AND PRACTICE § 7851 (rev.

vol. 1985 & 1997 Supp.)(mere fact that interest is not charged upon a note accepted for premiums does not bring the contract within the terms of a rebating statute); 5 COUCH ON INSURANCE § 30:59 (2d ed. rev. vol. & 1996 Supp.)(failure to exact interest upon a note given for a premium does not exact a rebate).

The Supreme Court of Missouri reached a like result in a libel and slander action initiated by an insurance agent against a competing agent. *Sullivan v. Connecticut Mut. Life Ins. Co.*, 337 Mo. 1084, 88 S.W.2d 167 (1935). In a letter to the plaintiff's superior, the defendant charged the plaintiff, *inter alia*, with accepting policy premiums in twelve equal monthly installments, interest free, "which [in the defendant's words] amounts to rebating." *Sullivan*, 337 Mo. at 1087, 88 S.W.2d at 172. After considering the applicable Missouri anti-rebating statute,[16] the court rejected the plaintiff's argument, holding instead that

"[i]t is apparent from a reading of this statute that it does not prohibit the payment of a full annual premium in twelve equal monthly installments. Neither does this nor any other statute require the payment of interest on deferred installment payments on an annual premium or provide that the failure to charge interest on such payments shall amount to rebating. If defendant had charged plaintiff with

---

**16.** That statute provided in pertinent part:

"No life insurance company doing business in this state shall make or permit any distinction or discrimination in favor of individuals between insurants (the insured) of the same class and equal expectations of life in the amount or payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contracts it makes; nor shall any such company, or agent thereof, make any contract of insurance or agreement as to such contract other than as plainly expressed in the policy issued thereon; nor shall any such company, or any officer, agent, solicitor or representative thereof, pay, allow or give, or offer to pay, allow or give, directly or indirectly, as inducement to insurance, any rebate of premium payable on the policy."

*Sullivan v. Connecticut Mut. Life Ins. Co.*, 337 Mo. 1084, 1094, 88 S.W.2d 167, 172 (1935)(*citing* Mo. Stat. Ann. § 5729 (1929)).

rebating without giving the facts upon which such charge was based, then the charge would have been libelous because rebating is a violation of law. But where, as here, the letter does not charge a violation of the statute . . . it is not libelous."

337 Mo. at 1094, 88 S.W.2d at 172.

The sum and substance of the above cited cases is that the overwhelming opinion in those jurisdictions that have considered the issue *sub judice* is that insurer/insured credit arrangements fall without their respective anti-rebating insurance statutes. This result is consistent with the purposes of these statutes—that of eliminating discrimination in insurance rates among similar classes of insureds. Every Code provision cited by the Commissioner is directed towards ensuring that insurers justify and abide by rates established for the various insurance products offered for sale to the public. Again, §§ 226(a), 230(b), and 242(e) concern insurance rates, not the manner in which premiums charged in accordance with those rates are collected.

In our view, there is a critical difference between conferring a special advantage to an insured not specified in the policy as an inducement to purchase that policy versus assisting the insured in the procurement of insurance through the execution of a note bearing a confessed judgment. The latter is not wrought with the peril and imbued with the evil that anti-rebating laws were designed to reach. *See* Part V., *supra.*

Indeed, the Commissioner does not challenge Engelman's assertion that he used every effort to collect the balances due under the notes executed in his favor; nor does the Commissioner allege that either Engelman or Wynder charged rates other than those expressly provided for in their respective sureties' rate filings, attempted to rebate any part of the premium to their insureds, or otherwise waived part or all of any premium, thereby reducing the applicable rate. At all times the insureds or their benefactors remained fully liable for the balance represented by the notes. Although not an exclusive list, it is these activities that anti-rebating statutes

were designed to reach—activities that are conspicuously absent from the evidentiary record.

## VIII.

Furthermore, the Commissioner's own regulations certainly suggest a different interpretation of §§ 226(a), 230(b), and 242(e) from that which he now advances. Specifically, Md. Regs.Code (COMAR) tit. 09, §§ 30.94.09B and 30.94.11B, effective January 2, 1993,[17] specifically envision instances where unpaid balances will exist on bond premiums. Md. Regs.Code tit. 09, § 30.94.09, **Receipts**, provides:

"A.   A surety agent shall provide a numbered receipt to bail bond purchasers.   A copy of the receipt shall be retained by the surety agent.

B.   The receipts, at a minimum, shall contain the following information:

(1) The name, place of business, address, and telephone number of the surety agent;

(2) An itemized statement of the amount of bail and the jurisdiction for which the bond is being written;

(3) an itemized statement of the premium charged;

(4) **The amount collected by the surety agent;**

(5) **The unpaid balance, if any;  and**

(6) The amount, value, and description of any collateral collected." (Emphasis added).

Section 30.94.11, **Return of Collateral**, provides

"A.   Immediately upon the discharge of a bond, the licensee or surety agent shall return any collateral held by the licensee or the surety agent.   Upon receiving a request for return of collateral, the licensee or surety agent shall promptly determine whether the obligation has been discharged.

---

**17.**   *See* 19:26 Md. R. 2287.

B. The licensee or surety agent may deduct any unpaid premiums due on the bail bond from any collateral being returned." (Emphasis added).

Although the Commissioner insists that COMAR §§ 09.30.94.09B and 09.30.94.11B apply only to *approved* installment plans, that is not apparent from the language of those regulations. *See Chesapeake v. Comptroller*, 331 Md. 428, 440, 628 A.2d 234, 240 (1993); *Messitte v. Colonial Mortgage Service Co.*, 287 Md. 289, 295–96, 411 A.2d 1051, 1054 (1980)(when words of an administrative regulation are unambiguous, they will be accorded their natural and ordinary meaning). The Commissioner's decision to promulgate and adopt COMAR §§ 09.30.94.09B and 09.30.94.11B without any reference to §§ 226(a), 230(b), and 242(e) belies his interpretation of those regulations and certainly lends credence to Respondents' position. Thus, we hold that §§ 226(a), 230(b), and 242(e) do not prohibit insurers from securing premium obligations with promissory notes or other such credit arrangements, with or without interest.

### IX.

Engelman cross-petitions, claiming that the thirty-day suspension of his Certificate of Qualification was unwarranted and unsupported by the Code. Because the record fails to disclose what portion of Engelman's suspension is attributable to his failure to timely register and qualify Professional, we agree with the circuit court that a remand to the Commissioner is in order for a final determination of what sanctions should be imposed, if any, for those violations.

*JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE MARYLAND INSURANCE ADMINISTRATION.*